# EXHIBIT 6

1    SAMUEL ORTEGA #T-24740
2    MULE CREEK STATE PRISON #A1-145-U
     P.O. BOX 409020.
3    IONE, CA. 95640.
              Petitioner/Defendant and Appellant.

4                                                    FILED

5    IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
                                                    AUG 3 - 2005
6         SIXTH  APPELLATE DISTRICT      Court of Appeal, Sixth App. Dist.
                                         MICHAEL C. YERLY, Clerk
7                                        BY_____
                                                    DEPUTY
8    PEOPLE OF THE STATE OF CALIFORNIA,   No.: H023370.
9         Plaintiff and Respondents,'     (Santa Clara County
                                          Superior Court No.:
10        VS.                             B9949307/BB152091.)
11
12   SAMUEL ORTEGA,
          Defendant and Appellant.        H029127
13
14   SAMUEL ORTEGA, Petitioner,
15
16        VS.                                  X-Ref H023370
17
18   THE SUPERIOR COURT IN AND FOR THE
     COUNTY OF SANTA CLARA, et, al.,
19             Respondent,
20
21   THE ATTORNEY GENERAL OF THE STATE
     OF CALIFORNIA, MR. BILL LOCKYER,
22             Real Party in Interest.
23

24
25   PETITION FOR WRIT OF MANDATE/PROHIBITION:
26
27        A.)  INTRODUCTION OF CASE:
28   On July 21st, 2000, petitioner was charged by informa-

                    —1.—

1  -tion number B994307, with 18 felony counts including
2  violent assaults on multiple victims. (CT 205, "C.T."
3  refers to "Clerk's Transcripts", hereafter "CT".). All
4  of these offenses were committed in 1999. After
5  the fourth amended information was filed, the
6  petitioner was charged formally on April 30th,
7  2001, with 22 counts. Verdicts were returned
8  on May 2nd, 2001. (CT 591-631.) Petitioner was
9  convicted of all counts and enhancements, with
10 several exceptions. Sentence was imposed on
11 July 20th, 2001. Petitioner received a total
12 state prison term of life consecutive to
13 life consecutive to 25 years to life, conse-
14 -cutive to 55 years. (RT 1299-1300, 1303, "R.T."
15 refers to "Reporter's Transcripts', hereafter "RT.")
16 The abstract of judgment indicates, incorrectly,
17 that petitioner was sentenced to life without
18 the possibility of parole. (CT 686.) A timely
19 notice of appeal was filed on July 24th, 2001.
20 (CT 690). Attorney at Law, Mr. Charles M. Bonn-
21 -eau, #331 "J" Street, Ste: 200, Sacramento,
22 CA. 95814, (916) 444-8828; was whom represented
23 petitioner in his Opening Brief, and Petition
24 for Review, in this Court and California Supreme
25 Court. (Exhibit-A, att.) This Court in its disposi-
26 -tion stroke out the Penal Code section 667,
27 .61, subdivision (a) enhancement imposed in
28 connection with Count 1, and imposed in its

-2-

1  place an enhancement pursuant to Penal Code
2  section 667.61, subdivision (b), thereby reducing
3  defendant/Petitioner's sentence on Count 1 to
4  15 years to life. The superior court was thus
5  ordered to prepare an amended abstract of
6  judgment incorporating the above-mentioned
7  changes, but as so modified, the judgment
8  was affirmed. The Court futherly reminded,
9  in its Disposition, the superior court to insure
10  that the amended abstract correctly reflects
11  these changes, and that petitioner's sente-
12  -nce, in this case, "includes the possibility of
13  parole," and that a true copy be fowarded
14  to the Department of Corrections, of the
15  abstract of judgment, as amended by this
16  Court. The superior court never obeyed this
17  Honorable Court's Order, and petitioner is
18  consider a prisoner with a term of life-
19  without-the-possibility-of-parole; to a
20  harsh sentence with minimum and very
21  limited rights, and privileges, subject to
22  close custody counts because of this error
23  or clerical mistake caused by Superior Court
24  in not obeying this Court's Order.

25
26  B) Why <u>Extraordinary Relief is Warranted</u>:
27
28  Petitioner has no remedy at law, in which to

—3—

follow, in order to have the superior court obey this Court's Order to foward the new abstract of judgment with the mentioned changes to Department of Corrections, so petitioner be not consider a lifer without the possibility of parole, in violation of his Due Process of Law guaranteed under the 14th Amendment to the United States Constitution. In light of the absence of any adequate remedy at law due to the non-appealability of such orders, extraordinary relief is warranted to order the superior court to process said amended abstranct of judgment reflecting the petitioner not to be a lifer without possibility of parole: (See: Exhibit-B, att.)

C.) A writ of mandate/prohibition is the appropriate remedy because petitioner will continue to suffer irreparable injury and prejudice with respect to been treated as the lifer-without-possibility-of-parole—, that he is not, unless the action is restrained, and prohibited;

D.) A writ of mandate is appropriate to compel respondent court to perform an act which the law specially enjoins;

—4—

WHEREFORE, Petitioner respectfully prays that:

1. This Honorable Court immediately issue its peremptory writ of mandate directing and compelling the respondent court to show cause before this Court, at an specific time and place, why the relief prayed for should not be granted;

2. For such other, and further relief as this Court may deem proper.

Respectfully submitted,

Dated: 7-21-05 .    /s/. Samuel Ortega

Samuel Ortega,
Petitioner.

E.) VERIFICATION:

I declare under penalty of perjury under the laws of California, the foregoing is true and correct. Executed at Mule Creek State Prison, at Ione, CA.

Respectfully submitted,

Dated: 7-21-05.    /s/. Samuel Ortega

Samuel Ortega,
Petitioner.

—5.—

# EXHIBIT "A"

# ☙ CHARLES M. BONNEAU — Attorney at Law

331 J Street
Suite 200
Sacramento, CA 95814
Telephone (916) 444-8828

December 23, 2002

SAMUEL ORTEGA  T-24740
San Quentin State Prison
San Quentin, CA   94964

Dear Mr. Ortega:

The court of appeal has reduced your sentence on one count, involving a life term, which has been reduced to 15 to life.  The judgment and sentence were affirmed in all other respects.

I have prepared a petition to the California Supreme Court, which I am mailing to your mother.  I will also be sending her the transcripts of your appeal.

I will let you know as soon as I hear from the Supreme Court.

Sincerely yours,

CHARLES M. BONNEAU

cc Natividad Duran

# EXHIBIT "B"

**COPY**

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAMUEL ORTEGA,<br><br>    Defendant and Appellant. | H023370<br>(Santa Clara County<br>Super. Ct. Nos. B9947307, BB152071)<br><br>**F I L E D**<br><br>NOV 2 2 2002<br><br>Court of Appeal - Sixth App. Dist.<br>By ————————————<br>                    DEPUTY |

A jury convicted defendant Samuel Ortega of multiple sexual offenses, assault with a deadly weapon, attempted kidnapping for rape, and possession of a controlled substance. The convictions involved 20 counts relating to nine different female victims. The trial court sentenced defendant to two consecutive life terms, consecutive to a term of 25 years to life, consecutive to a determinate term of 55 years in state prison. Defendant appeals, contending, among other things, that there was insufficient evidence to support the special circumstance of kidnapping that resulted in the term of 25 years to life imposed pursuant to Penal Code section 667.61.[1]

### A.  INTRODUCTION

The residents and shoppers in and around Latham Street in Mountain View had been terrorized by a series of nighttime assaults on women. Victim 1 was raped in 1997. Eight other women were attacked in 1999. Defendant was arrested on December 23,

---

[1] Hereafter, all undesignated statutory references are to the Penal Code.

1999 following a knife attack on Victim 9 that had occurred in the same general area that day. Mountain View Police Officers Vieyra and Hsiung interrogated defendant at length and asked him about Victim 9 and all the other victims that had been attacked in 1999. Defendant confessed to all of the 1999 attacks. DNA evidence confirmed defendant's connection to the 1997 attack on Victim 1. The prosecutor charged defendant with offenses relating to all nine of the victims. Defendant pled not guilty.

At the beginning of trial the court granted defendant's motion in limine to suppress a large part of his confession. (*Miranda v. Arizona* (1966) 384 U.S. 436.) As a result, the prosecutor chose to go to trial on only the counts relating to Victim 1 and Victim 9. The trial court permitted evidence of an uncharged attack on Victim 8 under Evidence Code section 1101, and noted that if defendant chose to testify, his confession to all of the other attacks would then be admissible to impeach his testimony. The prosecutor made it clear that if the confession was later admitted she would seek to amend the information and add the counts that were severed at the beginning of trial.

Defendant did testify, against the advice of his attorney. On cross-examination and over objection the prosecutor asked defendant about the attacks on all the victims and he denied them all. The prosecution moved to amend the information and during the rebuttal phase presented evidence of the entire confession and of the attacks on all the other victims. The jury convicted defendant on 20 of 22 counts.

## B.   FACTS

### 1.   *The People's Case in Chief*

On March 24, 1997, Victim 1 got off work around 11:20 p.m. and started walking home. When she reached Latham Street someone grabbed her and pulled her about 40 feet into the bushes. She felt a knife to her back. Her assailant told her to get on her knees. When the attacker spoke to her, Victim 1 thought she recognized a Salvadoran accent. The attacker grabbed her vagina and inserted his fingers. Then he put his penis in her vagina, then in her anus, and then again in her vagina, and then ejaculated. Victim

1 ran home and told her family what had happened. She was crying and shaking. A police officer responded and Victim 1 was taken to the hospital for an examination. The examination was consistent with forcible rape. DNA samples were taken and preserved. These samples were later determined to have come from the defendant. Victim 1 testified that although at the time of the rape defendant had been wearing a dark sweatshirt with the hood tied tight around his face, she recognized his eyes and his voice and positively identified defendant as the man who had attacked her.

Over two years later, at 5:40 on the morning of December 23, 1999, Victim 8 was walking to work when she was hit on the lower leg by a bicycle. Two workmen were sitting in their trucks in the vicinity of Latham Street at the time. One of the men saw a man on a bicycle hitting a woman who was on foot. The victim screamed and got away when two men ran up. The assailant rode off on his bicycle. One of the workmen later positively identified defendant as the person he saw riding a bicycle in the same area that morning.

Less than an hour later, around 6:20 a.m., Victim 9 left her house to get in her car to go to work. When she opened her car door a man stood up from behind the next car in the parking lot. The man was wearing a jacket with a hood, but when the hood came down Victim 9 recognized defendant—the "Salvadorian" who lived four trailers down from her own. Defendant slashed at her and cut her cheek and throat. The wounds required 50 to 60 stitches to close and Victim 9 continues to have trouble eating and drinking. Later, an investigating officer went to defendant's trailer where he seized defendant's jacket and a bicycle that was parked nearby. Blood on the jacket was determined to have come from Victim 9.

2.    *The Defense Case*

Defendant testified that he did not remember attacking or raping Victim 1 in 1997. He admitted that he knew who Victim 1 was, but he just did not remember whether he ever had sex with her. He said that he had had relations with a lot of women, but not by

3

force. As to the attack on Victim 9 on December 23, 1999, defendant admitted that he might have been there in the parking lot, but that he did not do harm to anyone. He said he had been drinking and doing cocaine and that he was very "messed up" at the time.

On cross examination defendant again responded that he might have had sex with Victim 1, but not by force. The prosecutor asked him about each of the uncharged attacks and he denied them all. Defendant said that he was never hiding any place. "At night I'm at home with my wife." He denied that he waited in the bushes for girls to walk by. He denied carrying a knife in 1999. He said that he had never attacked anyone. "[E]ven less would I do harm to a woman." He testified that he had no need to rape, and that he was not capable of cutting anyone. He denied ever crashing into anyone with his bicycle, and he denied ever telling anyone to take off her clothes. Defendant also claimed that he didn't go out of his house at night.

The prosecutor went on to quote directly from the transcript of defendant's previously suppressed confession, addressing each of the 1999 attacks in turn. In brief, defendant claimed that he did not remember what he had said to the police, and, in parts, flatly denied or contradicted the statements he had made.

### 3.    Rebuttal.

Victim 2 testified that on March 15, 1999 she was walking on Latham Street when a man wearing a mask came out from behind some bushes with a knife. Victim 2 yelled and either fell or was pushed to the ground. In less than a minute, someone came from across the street and the attacker ran away. When defendant was questioned about this incident in December, he said that he had been urinating in a corner and saw the victim approaching. He admitted hitting her.

Later that same night, Martin Gatica was walking in the area of Latham Street and saw a man attack a woman. Gatica testified that the woman was on her knees and the man was grabbing her clothes and had a knife to her chest. Gatica confronted the attacker and the attacker left. The attacker had been wearing a ski mask and Gatica could

4

not identify him. Defendant later described this incident to the police. He said the victim was the sister of a person who beat him up. He admitted hiding in the bushes, grabbing her as she passed, and holding her down with a knife. Defendant also admitted having told her to take her clothes off. This third victim was never identified.

Victim 4 was out of the country at the time of trial. Her sister-in-law testified as to the incidents pertaining to the attack on her. She said that on April 6, 1999 Victim 4 came to her house, hysterical and out of breath. Victim 4 said that a man wearing a black ski mask came from the bushes on Latham Street carrying a knife, and that he attacked her and threw her to the ground. Victim 4 gave the same story to the police officers that came to investigate. She told them she had defended herself with her shopping bags. There were tears in the shopping bags and in Victim 4's shirt that were consistent with her story. The attack on Victim 4 occurred in the same location as the attack on Victim 2 the month before. In his statement to the police in December, defendant said Victim 4 was someone who had told him "bad things" in the past. He said that he hid in the bushes with a knife and that she fought him off with her shopping bags.

Victim 5 testified that she was visiting this country from Korea. On May 8, 1999 at around 8:35 p.m. she walked down Latham Street and saw a man standing behind a tree. His face was covered with a ski mask and he carried a knife, which Victim 5 described as eight to nine inches long. Victim 5 fled down the street. She screamed and threw the shopping bags she had been carrying over her shoulders as she ran. She felt a knife plunge into her right hip. The attacker ran away. The officer investigating the incident found a little "cropped out" area behind the bushes where the attack occurred. The location where Victim 5 was attacked was the same place Victim 3 had been attacked in April. In his statement to the police in December, defendant described the incident as the one with "the Chinese woman." He said that he hid in the bushes until she walked by, then he jumped, yelled, and swung a knife at her legs. Defendant claimed the

knife was a 10-inch knife he had taken from his job at Boston Market. He did not know if he had cut his victim. He said that she tripped and fell.

Defendant was stopped and questioned by a police officer on May 13, 1999 because he resembled an artist's sketch of the person suspected of the Latham Street crimes. There were no attacks in the Latham Street area for six months following this contact.

Then, on November 13, 1999 Victim 6 was walking on a nearby street when a person came from behind her and threw a bicycle on her. Victim 6 was unavailable to testify so the transcript of her testimony at the preliminary hearing was read into the record. She said that the man had grabbed her around the chest and threatened to take out a knife. He took her behind the bushes and told her to take her clothes off. Victim 6 offered him money, but he again told her to take her clothes off. He sat on her thighs and tried to take off her blouse. He put a hand over her mouth and she bit him, he hit her, and she screamed. Someone came along and the attacker ran away. Victim 6 could not identify her assailant because a hood had obscured his face. Defendant described this attack to the police. He said he threw the victim to the ground, ordered her to take her clothes off and described how she was "on all fours." Defendant claimed that if he had wanted to rape Victim 6 he could have done so because "there was time."

Victim 7 testified that on November 20, 1999 she and a friend were looking for a store in Mountain View. They had got off the bus and were walking along looking for the store when Victim 7's friend saw a man approaching quickly. She warned Victim 7, but it was too late. The man grabbed Victim 7 by the hair, put a 10-inch knife to her throat, and forced her into the bushes. He told her to take her clothes off and tried to force her to the ground. Victim 7 screamed. In the struggle, the attacker's hood came loose and when he tried to fix it, Victim 7 pushed him away from her and ran. Her attacker fled. In his December statement to the police, defendant admitted the attack on

6

Victim 7. He said he had threatened Victim 7 with a knife and he admitted telling her to take her clothes off.

### C.    THE OPERATIVE PLEADING AND THE VERDICT

The prosecutor amended the information to conform to proof. The Fourth Amended Consolidated Information included 22 counts:

Victim 1 (3/24/97):

Count 1-Penetration with a foreign object (§ 289, subd. (a)) with special circumstances pursuant to section 667.61, subdivisions (a) and (e), personal use of a dangerous and deadly weapon (§ 12022.3, subd. (a)) and kidnapping (§ 207));

Count 2-Forcible rape (§ 261, subd. (a)(2)) with special circumstances as alleged in Count 1;

Count 3-Forcible sodomy (§ 286, subd. (c)(2)) with special circumstances as alleged in Count 1;

Count 4-Forcible rape (§ 261, subd. (a)(2)) with special circumstances as alleged in Count 1.

Victim 2 (3/15/99):

Count 5-Attempted forcible rape (§§ 664, 261, subd. (a)(2)) with an enhancement for use of a dangerous and deadly weapon (§ 12022.3, subd. (a));

Count 6-Assault with a deadly weapon (§ 245, subd. (a)(1)).

Victim 3 (3/15/99):

Count 7-Attempted forcible rape (§§ 664, 261, subd. (a)(2)) with an enhancement for use of a dangerous and deadly weapon (§ 12022.3, subd. (a));

Count 8-Assault with a deadly weapon (§ 245, subd. (a)(1)).

Victim 4 (4/6/99):

Count 9-Attempted forcible rape (§§ 664, 261, subd. (a)(2)) with an enhancement for use of a dangerous and deadly weapon (§ 12022.3, subd. (a));

Count 10-Assault with a deadly weapon (§ 245, subd. (a)(1)).

Victim 5 (5/8/99):

Count 11-Attempted forcible rape (§§ 664, 261, subd. (a)(2)) with an enhancement for use of a dangerous and deadly weapon (§ 12022.3, subd. (a));

Count 12-Attempted murder (§§ 664, subd. (a), 187).

Victim 6 (11/13/99):

Count 13-Kidnapping for rape (§ 209, subd. (b)) with an enhancement for use of a dangerous and deadly weapon (§ 12022, subd. (b)(1));

Count 14-Attempted forcible rape (§§ 664, 261, subd. (a)(2)) with an enhancement for use of a dangerous and deadly weapon (§ 12022.3, subd. (a));

Count 15-Assault with a deadly weapon (§ 245, subd. (a)(1)).

Victim 7 (11/20/99):

Count 16-Kidnapping for rape (§ 209, subd. (b)) with an enhancement for use of a dangerous and deadly weapon (§ 12022, subd. (b)(1));

Count 17-Attempted forcible rape (§§ 664, 261, subd. (a)(2)) with an enhancement for use of a dangerous and deadly weapon (§ 12022.3, subd. (a));

Count 18-Assault with a deadly weapon (§ 245, subd. (a)(1)).

Victim 8 (12/23/99):

Count 19-Attempted forcible rape (§§ 664, 261, subd. (a)(2)).

Victim 9 (12/23/99):

Count 20-Attempted premeditated murder (§§ 664, subd. (a), 187, 189);

Count 21-Attempted forcible rape (§§ 664, 261, subd. (a)(2)) with an enhancement for use of a dangerous and deadly weapon (§ 12022.3, subd. (a)).

Other:

Count 22-Possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)).

The jury convicted defendant on all counts and found true all enhancements and special circumstances alleged with the following exceptions. The jury found defendant

not guilty of the attempted murder of Victims 5 and 9 but did find him guilty of the lesser included offense of assault with a deadly weapon (Counts 12 and 20). The jury found defendant not guilty of attempted forcible rape of Victim 8 (Count 19) and could not reach a verdict on the attempted forcible rape of Victim 9 (Count 21). A mistrial was declared as to the latter and the prosecution dismissed that count.

The trial court sentenced defendant on Counts 1 through 4 pursuant to section 667.6, subdivision (c) and sentenced him on all other counts pursuant to section 1170.1. Defendant received consecutive life terms on Counts 13 and 16 (kidnapping for rape) and a consecutive term of 25 years to life for Count 1 (penetration with a foreign object). Defendant also received an aggregate, consecutive term of 55 years on the remaining counts and enhancements.

### D.    ISSUES

Defendant raises the following issues on appeal:

1.    Did the trial court abuse its discretion under Evidence Code section 352 in admitting evidence of the attacks on Victim 2, Victim 4 and Victim 5?

2.    Was the evidence sufficient to support a finding that defendant had the specific intent to rape Victim 2, Victim 4, and Victim 5?

3.    Where there is insufficient evidence under the applicable standard to support the jury's finding that defendant committed the simple kidnapping of Victim 1 (§ 207), may we instead consider the finding a de facto determination that defendant had committed kidnapping for rape? (§ 209, subd. (b).)

4.    Defendant points out that abstract of judgment incorrectly indicates that he was sentenced to three terms of life without the possibility of parole rather than two indeterminate life terms for Counts 13 and 16, and one indeterminate term of 25 years to life on Count 1, all with the possibility of parole. In addition, the abstract of judgment

9

refers to the Count 13 offense as having occurred in 1997 when the correct date is 1999. The People concede these mistakes.[2]

### E.    DISCUSSION

*1.    Admissibility of the Evidence of Attacks on Victims 2, 4, and 5.*

Defendant was convicted of the attempted forcible rape of Victims 2 through 7. The charges relating to all the victims other than Victim 1 and Victim 9 were severed from the case when the trial began. When defendant chose to testify, his statements pertaining to the uncharged acts became admissible to the extent they were inconsistent with his trial testimony or otherwise constituted impeachment. (See *Harris v. New York* (1971) 401 U.S. 222; *People v. May* (1988) 44 Cal.3d. 309.) If admissible as prior inconsistent statements, the statements would also be admissible as substantive evidence of the crimes they revealed. (Evid. Code, § 1235.) Defendant does not disagree with this analysis, nor does he challenge the admissibility of evidence of the attacks on Victims 3, 6, or 7. He contends only that since the attacks on Victims 2, 4, and 5 did not have a sexual component (such as grabbing at their clothes or telling them to take their clothes off), evidence of these attacks was not probative of the only issue upon which he could be impeached, i.e., his intent to rape Victim 1 or Victim 9. Defendant argues that the probative value of the evidence of these attacks was at the most "very slight," so that the trial court abused its discretion in permitting the evidence as impeachment. The People contend that the evidence was properly admitted to impeach defendant's testimony at trial as allowed by California Constitution, article I, section 28, subdivision (d) and *People v. Wheeler* (1992) 4 Cal.4th 284, 296 (*Wheeler*).

---

[2] Defendant also argues that as to Counts 12 and 20 the jury was incorrectly permitted to make a special finding that defendant had personally used a dangerous and deadly weapon. (§ 12022, subd. (b)(1).) Since these findings had no effect on the judgment, we do not address this issue. (See § 1237.)

10

According to defendant, at the point at which he completed his testimony on direct examination his identity as the assailant of Victim 1 and Victim 9 had been established. DNA evidence identified him as the perpetrator of the rape of Victim 1. Victim 9 positively identified him because she knew him. Defendant argues that since his identity had been established, the only issue for which any of the uncharged conduct was relevant was the issue of whether he had the intent to rape either of these victims. In our view, the acceptable scope of impeaching evidence was not so circumscribed.

In order to constitute impeachment, the evidence does not necessarily have to controvert defendant's testimony on any one discreet issue. The jury is permitted to consider "any matter that has any tendency in reason to prove or disprove the truthfulness of [the witness's] testimony at the hearing." (Evid. Code, § 780.) That is, the prosecutor was entitled to put on evidence from which a jury might conclude that defendant was not to be believed. Therefore, so long as defendant's testimony raised a factual dispute over any of the elements of the charged offenses, his credibility was subject to attack.

Defendant did dispute the crimes that were charged. He admitted on direct examination that he might have had sex with Victim 1 but that he did not have sex by force. Therefore, he implied that if intercourse occurred, Victim 1 had consented to it. He flatly denied doing harm to Victim 9. He also testified that he was very "messed up" on alcohol and cocaine at the time of that attack, suggesting that he was incapable of forming the specific intent necessary to the attempted rape and murder charges. Therefore, even if we presume that the prosecution had conclusively established that defendant was the person who had intercourse with Victim 1, and that he was the person who cut Victim 9, defendant's credibility was nevertheless a fact in issue.

The attacks on Victims 2, 4, and 5 demonstrated immoral conduct. Evidence of such conduct is relevant to the issue of credibility and admissible, subject only to the court's discretion under Evidence Code section 352. (*Wheeler*, *supra*, 4 Cal.4th 284; and see Cal. Const., art. I, § 28, subd. (d).) *Wheeler* counsels that the offer of evidence of

11

immoral conduct for impeachment (as opposed to evidence of a felony conviction) often entails problems of proof and unfair surprise and evaluation of moral turpitude. "Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Wheeler, supra,* 4 Cal.4th at pp. 296-297.) The trial court enjoys broad discretion in determining whether the probative value of evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) "Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' (*People v. Jordan* (1986) 42 Cal.3d 308, 316.)" (*Id.* at pp. 1124-1125.) Keeping these rules in mind, we find no abuse of discretion.

When a felony conviction is offered for impeachment, the problems of proof, unfair surprise, and evaluation of moral turpitude are minimal because the conviction itself reliably proves the conduct, a party is unlikely to be surprised by the use of his or her own felony conviction, and the court determines moral turpitude from the " 'least adjudicated elements' " of the offense for which the witness was convicted. (*Wheeler, supra,* 4 Cal.4th at p. 297, fn. 7.) In this case, even without a felony conviction those problems were also minimal. The conduct was of the type that indisputably shows defendant's general readiness to do evil. (See *Gertz v. Fitchburg Railroad* (1884) 137 Mass. 77, 78; *People v. Castro* (1985) 38 Cal.3d 301, 314.) Even without evidence of sexual intent, the attacks on Victims 2, 4, and 5 substantively constituted the crime of assault with a deadly weapon, which has been determined to be a crime of moral turpitude. (*People v. Cavazos* (1985) 172 Cal.App.3d 589, 595.) "The average person walking down the street would believe that anyone who unlawfully attempts to injure another with a deadly weapon is guilty of some degree of moral laxity." (*Ibid.*)

12

Defendant's having jumped out of the bushes and attacked these women with a knife plainly demonstrates moral laxity. Proof of the acts was made by defendant's own confession, not solely on the allegations of the third parties. And there was no possibility of surprise because defendant was warned before trial began and before he actually took the stand that the prosecutor intended to use this evidence to prove that he was not telling the truth.

In addition to its relevance as impeachment, generally, the evidence directly contradicted defendant's testimony. The evidence tended to show defendant's planning and preparation as to both the sexual offenses and to the charge of attempted premeditated murder. As to the evidence of the attack on Victim 2, defendant told the police officers that he had seen her coming down the street so he hid and then he hit her. Defendant admitted that he hid in the bushes waiting for Victim 4, and that he threw her to the ground and tried to stab her with a kitchen knife. Defendant also admitted lying in wait for Victim 5 and when she walked by he jumped out in front of her and yelled and swung a knife at her. In short, the evidence was that on these three occasions defendant hid himself to surprise his victims and threatened them all with a knife. From that evidence a jury could reasonably conclude that he did the same thing in connection with his encounter with Victim 1 and that as to her, the encounter was not consensual as defendant suggested it must have been. A jury could also reasonably infer from evidence of these three attacks that defendant was also lying in wait for Victim 9, planning the attack rather than to believe, as defendant implied, that if he did cut her it was the result of his inebriated condition.

In sum, we cannot say that the trial court's decision to admit this evidence was arbitrary, capricious, or patently absurd. There was no abuse of discretion.

2.    *Sufficiency of the Evidence - Intent to Rape Victims 2, 4, and 5.*

Defendant argues that the convictions of attempted rape as to Victims 2, 4, and 5 must be reversed because, although there is substantial evidence that these women were

attacked, there is insufficient evidence that defendant harbored the specific intent to commit rape when he attacked them. The Attorney General argues that the evidence of circumstances surrounding the crimes is sufficient to support an inference that defendant intended to rape.

In order to support a conviction for attempted rape there must be substantial evidence that defendant specifically intended to engage in sexual intercourse with the victim. (*People v. Marshall* (1997) 15 Cal.4th 1, 36; *People v. Dillon* (1983) 34 Cal.3d 441, 452-453.) "Specific intent may be, and usually must be, inferred from circumstantial evidence." (*People v. Cole* (1985) 165 Cal.App.3d 41, 48.) In order to base a conviction upon circumstantial evidence, the jury must find that the facts and circumstances are not only entirely consistent with the theory of guilt but are also inconsistent with any other reasonable conclusion. (*Ibid.*) But this rule only applies to the fact finder. If the jury, by its verdict rejects the reasonableness of any conclusion pointing to innocence, and there is evidence to support the implied finding that guilt is the more reasonable of the two conclusions, then the reviewing court is bound by the finding of the jury. (*Ibid.*) Therefore, whether the evidence is direct or circumstantial, the relevant inquiry is the same. We view the record as a whole, in the light most favorable to the judgment. (*People v. Johnson* (1980) 26 Cal.3d 557, 576-578.) We accept any reasonable interpretation of the evidence that supports the judgment so long as it is evidence of ponderable legal significance, reasonable in nature, credible, and of solid value. (See *People v. Johnson, supra*, 26 Cal.3d at p. 576; *People v. Holt* (1997) 15 Cal.4th 619, 668-669.) Unless it clearly appears that "upon no hypothesis whatever is there sufficient substantial evidence to support it" we cannot set aside the judgment. (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

Evidence of prior acts of misconduct is probative of a person's intent on another occasion. The more similar the other acts are to the act being analyzed, the greater their probative value will be. The reasoning stems from an intuitive understanding that if

14

something happened for a particular reason on one or more separate occasions, it is likely that it happened for the same reason on the occasion being analyzed. (See *People v. Robbins* (1988) 45 Cal.3d 867, 879-880, citing 2 Wigmore, Evidence (Chadbourn rev. 1979) § 302, at p. 241; see also *People v. Carpenter* (1997) 15 Cal.4th 312, 379.) The rationale for admitting prior acts to show intent applies equally to acts occurring before or after or around the same time as the occasion in issue.

Here we have not just one or two similar acts from which to infer defendant's intent on the three occasions he challenges. We have one rape (Victim 1) and three attempted rapes (Victims 3, 6, and 7) that were carried out in a fashion that was nearly identical to the manner in which defendant commenced the attacks on Victims 2, 4, and 5. Defendant raped Victim 1 in 1997 by jumping out at her from behind the bushes. He threatened her with a knife, pulled her to a secluded area, forced her to her hands and knees, and raped her from behind. Every other attack began in almost exactly the same way. Defendant leapt from the bushes surprising his victim; he hid his face, and he threatened her with a knife. He never robbed the victim or snatched purses or parcels. In four of the seven convictions for rape or attempted rape, after defendant had overpowered his victim, he told her to take her clothes off, grabbed her, or on the one occasion he actually accomplished the rape. In each of the three cases defendant challenges the assault was fortuitously aborted by a passerby or by the victim's vigorous resistance. Victim 2 said that a man came by within about 30 seconds of the attack. Victim 4 screamed and defended herself with her shopping bags. Victim 5 screamed and ran away, throwing everything she was carrying over her shoulders at her assailant. Thus, in none of these three cases did defendant ever overpower the victim and so did not have the opportunity, as he did in the other four cases, to proceed with his intended course of action.

*Walters v. Maass* (9th Cir. 1995) 45 F.3d 1355 (*Maass*), upon which defendant relies, is not applicable here. In *Maass*, the defendant was convicted of attempted rape

and attempted kidnapping based upon evidence that he approached a teenage girl and asked her to get in his truck to help him find a lost German Shepard dog. Defendant's intent was inferred from his prior conviction for kidnapping and rape in which he had used exactly the same modus operandi. The Ninth Circuit determined that "[c]ertainly Walters' intent is manifested by (1) evidence regarding his use of the German shepherd ruse in 1981 to kidnap, rape, and sodomize another thirteen-year old girl, (2) his persistent attempts to lure the victim into his truck using the same ruse, (3) his actions in following the victim home, (4) his strange speech patterns when he talked to the victim's mother, and (5) his statements to the police officer." (*Id.* at p. 1359.) The court determined, however, that under the Oregon law of attempt, the defendant's attempt to entice the victim into his truck did not constitute a substantial step toward the commission of the crime of rape. (*Id.* at p. 1360.) The issue here is not whether defendant's conduct was sufficient to constitute an attempt, but simply whether there is sufficient evidence to support a finding that defendant harbored the specific intent to commit rape. Even the *Maass* court felt that the single prior conviction was evidence of intent.

The evidence of defendant's intent as to Victim 2 is further supported by the fact that later on the same night he attacked Victim 2 he also attacked Victim 3. In his second attack of the night defendant was able to take his victim to a secluded place behind the bushes and get her on her hands and knees on the ground before a passerby interrupted the attack. The Victim 3 attack also provides support for a finding that defendant intended to rape Victim 5 because he attacked Victim 5 from the very same cropped out place in the bushes where he was seen attacking Victim 3.

Defendant's confession provides additional support for the conclusion that he intended to rape Victims 2, 4, and 5. In his interview with officers Vieyra and Hsiung, defendant independently raised the issue of rape more than once. As to Victim 9, defendant said: "Um-hum, I went over there by myself; but, no, but, no . . . because they

think I wanted to rape her, that's what they say. But, no, why would I. I have a lot of girlfriends, too, I have a lot of girlfriends, so I have no need to be doing that." In reference to the attack on Victim 8, defendant said: "Yes. No, well, I . . . like I tell you, I did. . . . I mean, I do accept, but what I don't like is that, I mean, that they're going to say that [it was] for the purpose of raping them." Officer Vieyra said: "No?" To which defendant responded, "Me, for the purpose of raping a woman, not me. That's why I have a big mouth, to speak up." Defendant's unprompted references to rape could reasonably be construed as demonstrating a general consciousness of guilt in that regard.

The foregoing is sufficient evidence from which a jury could reasonably have drawn the inference that defendant intended to rape Victim 2, Victim 4, and Victim 5.

### 3.    The Kidnapping Special Circumstance (Counts 1-4).

Section 667.61 sets forth a harsher sentencing scheme for certain sex crimes perpetrated by force, including each of the offenses alleged in Counts 1 through 4. Subdivision (a) of section 667.61 provides: "A person who is convicted of [a specified offense] under one or more of the circumstances specified in subdivision (d) or under two or more of the circumstances specified in subdivision (e) shall be punished by imprisonment in the state prison for life and shall not be eligible for release on parole for 25 years except as provided in subdivision (j)." Subdivision (b) reduces the sentence to 15 years to life if only one of the circumstances specified in subdivision (e) is found true. Among the circumstances specified in subdivision (e) are kidnapping in violation of section 207, 209, or 209.5, and use of a dangerous or deadly weapon or firearm in violation of section 12022, 12022.3, 12022.5, or 12022.53.

Counts 1 through 4 concerned the 1997 attack on Victim 1. As to each of these counts the prosecution alleged two special circumstances: use of a dangerous or deadly weapon (§ 12022.3, subd. (a)) and simple kidnapping (§ 207). The trial court imposed the indeterminate term of 25 years to life for Count 1 based upon the jury's having found both these circumstances to be true. Defendant argues that there is insufficient evidence

17

to support the jury's finding that he kidnapped Victim 1 under the applicable test for simple kidnapping. Since there is evidence to support only one of the alleged special circumstances, defendant claims his sentence on this count should be reduced to 15 years to life pursuant to section 667.61, subdivision (b).

People v. Caudillo (1978) 21 Cal.3d 562 (Caudillo) stated the former rule for simple kidnapping (§ 207). Under Caudillo, the sufficiency of the evidence to support the element of asportation depended upon the distance the victim was moved. (Caudillo, supra, 21 Cal.3d at p. 574.) Asportation of 75 feet or 90 feet was insufficient as a matter of law to support a conviction for simple kidnapping. (People v. Brown (1974) 11 Cal.3d 784, 789; People v. Green (1980) 27 Cal.3d 1, 67.) People v. Martinez (1999) 20 Cal.4th 225 (Martinez) overturned Caudillo. Now the trier of fact may consider factors such as whether the movement increased the risk of harm and vulnerability of the victim, in addition to the distance the victim was moved. (Id. at p. 235.) Because Martinez was an enlargement of the kidnapping statute, the new rule was not retroactive. (Id. at p. 241.) The attack on Victim 1 occurred in 1997, so Martinez does not apply. Since defendant dragged Victim 1 only 35 to 40 feet into the bushes, there is insufficient evidence under Caudillo to support a finding that defendant had committed a simple kidnapping in violation of section 207.

The Attorney General concedes that there is insufficient evidence to support a finding of simple kidnapping of Victim 1 but argues that the jury's finding that defendant had kidnapped her coupled with its guilty verdict on the substantive sexual offenses, constitutes a de facto finding that defendant had kidnapped Victim 1 for the purpose of committing a sexual offense (§ 209, subd. (b)(1)). Section 209 is another of the special circumstances specified by section 667.61.[3] Therefore, if the jury effectively found

---

[3] Defendant counters that the People's position is contrary to the recent decision in People v. Mancebo (2002) 27 Cal.4th 735 (Mancebo). We do not find Mancebo to be (continued)

18

defendant guilty of violating section 209, his sentence of 25 years to life may stand. We are not persuaded.

People v. Jones (1999) 75 Cal.App.4th 616 (Jones), upon which the Attorney General relies, is distinguishable. In Jones, the jury found the defendant guilty of kidnapping during the commission of a carjacking. (§ 209.5.) On appeal, the parties agreed that there was insufficient evidence to support the conviction because the offense of kidnapping during the commission of a carjacking requires a completed carjacking and no completed carjacking had taken place. (Jones, supra, 75 Cal.App.4th at p. 624.) The appellate court determined, however, that the jury's findings supported the lesser-included offense of attempted carjacking. (Id. at pp. 627-628.) The trial court had instructed the jury, in connection with the original charge, that the " 'specific intent to facilitate the commission of carjacking must be present when the kidnapping commences.' " (Id. at p. 627.) The court had also instructed the jury " 'it is not necessary to establish that this purpose was accomplished. The crime is complete if the kidnapping is done for that purpose.' " (Id. at p. 628.) Although the appellate court presumed this latter instruction was incorrect insofar as it applied to the kidnapping for carjacking offense, since the jury was so instructed and returned a guilty verdict, the jury effectively found a direct but ineffectual act done towards the commission of the carjacking, i.e., the forcible moving of the victim with the intent to carjack. (Ibid.)

---

entirely on point. In Mancebo, the jury had convicted the defendant of sex offenses against two victims and found true two special circumstances as to each victim. After conviction, the trial court substituted a multiple victim special circumstance (§ 667.61, subd. (e)(5)), which had not been pleaded, for the gun-use circumstance that had appeared in the pleading. The court then used the gun-use finding to further enhance the sentence under another code section. (Mancebo, supra, 27 Cal.4th at p. 740.) The primary basis for reversal was that the defendant had no notice that the facts alleged in the information would be used to provide an even harsher sentence than that which appeared from the pleading. (Id. at p. 753.) Notice is not an issue that is before us in this case.

Therefore, by convicting the defendant of kidnapping during the commission of carjacking under the instructions it was given, the jury determined both the elements required to prove attempted carjacking: (1) the specific intent to facilitate the commission of carjacking and (2) a direct act done towards the commission of the offense. (*Ibid.*)

The same is not true here. Defendant was charged in Counts 13 and 16 with the substantive crime of kidnapping to commit rape. (§ 209, subd. (b)(1).) In connection with those counts, the court instructed the jury in the language of CALJIC No. 9.54 (1998 Revision). Among other things, the jury was told that it must determine: "[T]he movement of that person was caused with the specific intent to commit rape, and the person causing the movement had the required specific intent when the movement commenced." But this instruction applied only to Counts 13 and 16. A similar instruction would have to have been given in connection with Counts 1 through 4 in order for the jury to have made findings sufficient to support an allegation that the kidnapping of Victim 1 was undertaken with the requisite specific intent. No such instructions were given.

As to the substantive crime of Count 1, penetration, the jury was informed that proof of the crime required proof that "[t]he penetration was done with the purpose and specific intent to cause sexual arousal, gratification, or abuse." No specific intent is required for the rape or sodomy counts. As to the simple kidnapping special circumstance, the trial court instructed the jury that in order to prove that allegation "the following elements must be proved: [¶] 1. A person was moved by the use of physical force, or by any other means of instilling fear; [¶] 2. the movement of the other person was without her consent; and [¶] 3. The movement of the other person in distance was substantial in character." Therefore, in finding that defendant had kidnapped Victim 1, the jury did not also find that defendant did so with the specific intent to commit the

specified sexual offense because, unlike the jury in *Jones*, the jury was never asked to decide that fact.

There is insufficient evidence to support the finding of kidnapping in connection with Counts 1 through 4. Defendant does not challenge the true finding relating to his use of a knife. Therefore, since there is sufficient evidence to support only one special circumstance, the applicable sentencing provision requires that defendant's sentence on Count 1 be reduced to 15 years to life. (§ 667.61, subd. (b).) [4] Our decision does not affect the sentences imposed on Counts 2 through 4. (§ 667.61, subd. (g).)

## F.     DISPOSITION

We hereby strike the Penal Code section 667.61, subdivision (a) enhancement imposed in connection with Count 1 and impose in its place an enhancement pursuant to Penal Code section 667.61, subdivision (b), thereby reducing defendant's sentence on Count 1 to 15 years to life. The superior court is ordered to prepare an amended abstract of judgment incorporating the above changes. As so modified, the judgment is affirmed. We remind the court to insure that the amended abstract correctly reflects that all three life sentences imposed in this case include the possibility of parole and that the Count 13 offense took place in 1999. The superior court shall forward a copy of the amended abstract to the Department of Corrections.

---

[4] Because we have determined that there is insufficient evidence to support the finding of kidnapping as to Counts 1 through 4, we do not reach defendant's alternative argument relating to instructional error.

_____
Premo, Acting P.J.


WE CONCUR:


_____
Elia, J.


_____
Rushing, J.


People v. Ortega
H023370

## DECLARATION OF SERVICE BY MAIL

CASE NAME: RE: Samuel Ortega. CASE NO: H023370

I, Samuel Ortega , am a resident of the state of California Mule Creek State Prison ( M. C. S. P ) at Ione, County of Amador, California, and am at least 18 years of age, and am party to the within action. My mailing address is P.O. Box 409000, Ione, California 95640-9000.

On 7/21/05 , I served a true and correct copy of the following document(s);

Petition for Writ of Mandate, and Exhibits therein in support thereof.

On each party listed below by placing it in a sealed envelope, with adequate postage or provided, and depositing said envelope in the institutional mail box or turned said envelope to custodial personnel for the United States Mail at Mule Creek State Prison, P.O. Box 409000, Ione, California 956490900. Each party to the action has been duly served.

This copy is being mailed to:
Sixth District Court of Appeal #333 West Santa Clara Street, #1060, San Jose, CA. 95113-1717.

I have mailed additional copies to:
Attorney General #455 Golden Gate Avenue, Ste: 11,000 San Francisco, CA. 94102-3365, and : Santa Clara County Superior Court, #191 North First Street San Jose, CA. 95113-1090.

There is regular service by the United States Mail between the above place of mailing and the parties listed.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed this date: 7/21/ , 20 05, at Ione, California.

Signed: Samuel Ortega , CDC No: T-24740.


### M. C. S. P MAILROOM ACKNOWLEDGEMENT OF MAILING

DATE:_____ SIGNED:_____

# EXHIBIT 7



**ORIGINAL**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

SAMUEL ORTEGA,

    Petitioner,

    v.

THE SUPERIOR COURT OF
SANTA CLARA COUNTY,

    Respondent;

THE PEOPLE,

    Real Party in Interest.

H029127
(Santa Clara County
Super. Ct. Nos. B9947307,
BB152071)

**FILED**

AUG 17 2005

Court of Appeal - Sixth App. Dist.
MICHAEL J. YERLY, Clerk

BY _____ DEPUTY

BY THE COURT:

    The petition for writ of mandate/prohibition is denied without prejudice to petitioner seeking habeas relief in the Santa Clara County Superior Court.

(Premo, Acting P.J., Elia, J., and Mihara, J., participated in this decision.)

Dated   **AUG 17 2005**      _Premo_      Acting P.J.

## AFFIDAVIT OF TRANSMITTAL

I am a citizen of the United States, over 18 years of age, and not a party to the within action: that my business address is 333 West Santa Clara Street, Suite 1060, San Jose, CA 95113; that I served a copy of the attached material in envelopes addressed to those persons noted below.

That said envelopes were sealed and shipping fees fully paid thereon, and thereafter were sent as indicated via the U.S. Postal System from San Jose, CA 95113.

I certify under penalty of perjury that the foregoing is true and correct.

Michael J. Yerly, Clerk of the Court

_____
Deputy Clerk

$8$-17-05
_____
Date

CASE NUMBER: H029127

Office of the County Clerk
Santa Clara County Superior Court
191 North First Street
San Jose, CA 95113

Material Sent YES: _____

Samuel Ortega
T-24720
Mule Creek State Prison
P.O. Box 409000
Ione, CA 95640

Material Sent YES: _____

Office of the Attorney General
455 Golden Gate Avenue
Room 11,000
San Francisco, CA 94102

Material Sent YES: _____